**THORPE SHWER, P.C.**
William L. Thorpe (No. 005641)
Ryan S. Patterson (No. 024753)
Ian R. King (No. 034802)
3200 North Central Avenue, Suite 1560
Phoenix, Arizona  85012-2441
Telephone:  (602) 682-6100
Email:  docket@thorpeshwer.com
Email:  wthorpe@thorpeshwer.com
Email:  rpatterson@thorpeshwer.com
Email:  irking@thorpeshwer.com

*Attorneys for J.B. Hunt Transport, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| C.C., by and through her Guardian ad Litem, Crystal Gee, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>J.B. Hunt Transport, Inc., et al.,<br><br>Defendants. | No. CV-24-08064-PCT-SMM<br><br>**DEFENDANT J.B. HUNT TRANSPORT, INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>**(Oral Argument Requested)** |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant J.B. Hunt Transport, Inc. ("J.B. Hunt"), hereby moves the Court to dismiss Plaintiffs' Amended Complaint (the "Complaint") [Doc. 6] because the claims against it are federally preempted and, furthermore, fail to state a claim upon which relief can be granted. This Motion is supported by the following Memorandum of Points and Authorities, Exhibits, and the contemporaneously filed Notice of Certificate of Conferral.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

On April 2, 2024, Plaintiffs filed the Amended Complaint against Defendants J.B. Hunt, Borderlanders, Inc. ("Borderlanders"), and Shokhijakhon Bekmuradov

9485539

("Bekmuradov") for personal injuries and wrongful death arising from an automobile accident that occurred on October 10, 2023, near Kayenta, Arizona. Borderlanders' employee, Bekmuradov was driving a commercial truck for Borderlanders in the course of his employment, transporting a load of medical equipment (the "Load") from Denver, Colorado to Phoenix, Arizona when the accident happened. Borderlanders was the motor carrier for the Load that Bekmuradov was transporting. J.B. Hunt's only involvement is that it had brokered the Load to Borderlanders. This fact is important because: (1) Plaintiffs appear to be asserting Arizona common law negligence and vicarious liability claims against J.B. Hunt; and (2) such common law claims are expressly preempted by the Federal Aviation Authorization Administration Act, 49 U.S.C. § 14501(c) (the "FAAAA") and the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14501(b) (the "ICCTA") when asserted against brokers such as J.B. Hunt. As detailed below, Plaintiffs' claims are federally preempted and, even if not preempted, the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim for which relief can be granted.

## II.    FACTUAL BACKGROUND

When the accident happened, Bekmuradov was a commercial truck driver transporting the Load as an employee of Borderlanders. Borderlanders was and is a federally licensed interstate motor carrier with U.S. Department of Transportation ("USDOT") No. 3243700. *See* **Exhibit 1**, Borderlanders' USDOT Record[1]. Borderlanders was the registered owner of the commercial truck operated by Bekmuradov to transport the Load that was involved in the accident. *See* Compl. at ¶¶ 7, 24. As such, the Load and Bekmuradov were travelling under Borderlanders' federal motor carrier authority and USDOT number when the accident occurred. *Id.* At all relevant times, J.B. Hunt only served as the broker for purposes of the FMCSA under USDOT No. 80806. *See* **Exhibit 2**,

---

[1] Borderlanders' USDOT record is available on the Federal Motor Carrier Safety Administration ("FMCSA") SAFER System website. The Court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quotation marks and citation omitted); Fed. R. Evid. 201(b).

2

9485539

THORPE SHWER, P.C.

J.B. Hunt's USDOT Record. In other words, Borderlanders was the motor carrier responsible for transporting the Load pursuant to the Outsource Carrier Agreement with J.B. Hunt (the "OCA"). *See* **Exhibit 3**, OCA dated November 14, 2019[2]. The OCA states in part that J.B. Hunt is authorized to arrange for the transportation of freight, and Borderlanders is authorized to provide transportation services as a motor carrier. *Id.* at 1.

Under the OCA, Borderlanders was the federal motor carrier responsible for transporting the Load, and J.B. Hunt was the broker responsible for arranging transportation of the Load. Plaintiffs' concede that Borderlanders picked up, transported, and was supposed to deliver the Load, and that Bekmuradov was Borderlanders' employee driver. *See* Compl. at ¶ 24. Notwithstanding Plaintiffs' acknowledgement of J.B. Hunt's limited role as the broker, the Complaint appears to assert causes of action against J.B. Hunt for negligent hiring, supervision, entrustment, and retention of Borderlanders, and for vicarious liability. *Id.* at ¶¶ 35-38. However, Plaintiffs' claims are federally preempted and fail under Fed. R. Civ. P. 12(b)(6).

## III.   LEGAL ARGUMENT

### A.   Statutory Framework of Federal Motor Carriers versus Brokers

This case involves questions of federal statutes applicable to federal "motor carriers" and "brokers." A "motor carrier" is defined in 49 U.S.C. § 13102(12) as "a person providing motor vehicle transportation for compensation[,]" whereas a "broker" is defined in 49 U.S.C. § 13102(2) as "a person, ***other than a motor carrier*** or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." (emphasis added). There is no overlap in the statutes between "motor carriers" and "brokers." *5K Logistics, Inc. v.*

---

[2] Plaintiffs specifically refers to and rely upon the OCA in the Complaint. *See* Compl. at ¶¶ 22-24, 31. As such, the OCA is incorporated-by-reference as though apart of the Complaint itself, allowing the Court to consider it without converting this Motion into a motion for summary judgment. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citations omitted).

9485539

*Daily Exp., Inc.*, 659 F.3d 331, 335 (4th Cir. 2011) (quoting 49 U.S.C. § 13102(2)).

A motor carrier is the entity who actually performs the transportation, whereas a broker is the entity who arranges this transportation. In other words, motor carriers provide transportation whereas brokers provide services. Broker services include "***the arranging of transportation*** or the physical movement of a motor vehicle or of property." 49 C.F.R. § 371.2(c) (emphasis added). Under federal regulations, it is expressly the motor carrier's responsibility to maintain commercial auto liability insurance covering the motor carrier and the commercial driver. *See* 49 C.F.R. § 387.9. Similarly, the motor carrier, not the broker, is responsible for complying with other regulations such as maintaining a commercial driver qualification file (§ 391.51); maintaining the driver's prior employment history (§ 391.53); monitoring the driver's hours of service (§§ 392.3 and 395.3); arranging for the driver's drug testing (§ 392.4); proving maintenance of the commercial vehicle used in the transportation of freight (§ 396.3), among dozens of other requirements, which are inapplicable to brokers. As such, none of these enumerated duties are applicable to J.B. Hunt because Borderlanders was the motor carrier for the subject Load. This is consistent with Borderlanders' contractual duties as the motor carrier under the OCA. *See*, *e.g.*, **Exhibit 3** at ¶ 4.8.

### 1.    *J.B. Hunt was the broker, not the motor carrier.*

During all relevant times in this case, J.B. Hunt acted as the broker for purposes of the FMSCA, and Borderlanders was the motor carrier. Any effort to blur the facts of J.B. Hunt's role as the broker are simply unsupported by any factual allegations, directly contradicted by the plain language of OCA (*see* **Exhibit 3**), and Borderlanders' clear role as the federally licensed motor carrier transporting the Load. Simply put: J.B. Hunt has federal authority to operate as a broker (*see* **Exhibit 2**); J.B. Hunt also has federal authority to operate as a motor carrier (*Id.*); J.B. Hunt holds broker and motor carrier authority under the same USDOT number (*Id.*); and J.B. Hunt cannot act in both capacities at the same time. "A defendant may be either a motor carrier or a broker, but it cannot be both in the same transaction." *Ortiz v. Ben Strong Trucking, Inc.*, 624 F. Supp.

9485539

3d 567, 579 (D. Md. 2022) (citations omitted); *Schramm v. Foster*, 341 F. Supp. 2d 536, 549 (D. Md. 2004) (an entity may have authority to operate as both a broker and a carrier—it just cannot exercise this authority in the same transaction).

Accordingly, J.B. Hunt acted as the broker under the OCA and Borderlanders was the motor carrier transporting the Load. This distinction between broker and motor carrier is important because it affects the application of the express preemption provisions under the FAAAA and/or ICCTA detailed below.

### B.    Express Preemption Under the FAAAA and ICCTA

In 1994, Congress enacted the FAAAA to specifically promote the deregulation of motor carrier operations in the trucking industry, expressly providing that state regulation of the trucking industry is prohibited. *See* Pub. L. 103-105, § 601(a), 108 Stat. 1605 (1994) (Congress found that the regulations of intrastate transportation of property by the States unreasonably burdened free trade, interstate commerce, and American consumers). The FAAAA's express preemption provision was modeled after the same provision included in the Airline Regulation Act of 1978 (the "ADA"). As the Supreme Court has explained, just as with Congressional intent for the ADA preemption, Congress intended for FAAAA preemption to ensure that "States would not undo federal deregulation with regulation of their own" and ensure that "transportation rates, routes, and services" reflect "maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices[.]" *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 367-68, 371 (2008). Consistent with this Congressional intent, the preemption provisions under 49 U.S.C. § 14501 allow motor carriers and brokers to lawfully operate under one federal scheme of regulation rather than being subject to inconsistent duties arising out of varying states' laws. *See Rowe*, 552 U.S. at 373 (reasoning that the FAAAA preempts state laws as "state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations[,]" which "is inconsistent with Congress' major legislative effort to leave such decisions . . . to the competitive marketplace.").

. . .

THORPE SHWER, P.C.

9485539

The FAAAA *expressly preempts* a "[state] law, regulation, or other provision having the force and effect of law <u>related to</u> a price, route, <u>or service</u> of any <u>motor carrier</u> . . . <u>or broker</u>, or freight forwarder <u>with respect to the transportation of property</u>." 49 U.S.C. § 14501(c)(1) (emphasis added). Thus, the express preemption provision of the FAAAA covers both motor carriers and brokers. The 1995 FAAAA amendment, which is referred to as the ICCTA, also provides *express federal preemption* of "any state law, rule, regulation, standard, or other provision having the force and effect of law <u>relating to</u> intrastate rates, intrastate routes, <u>or intrastate services</u> of <u>any freight forwarder or broker</u>." 49 U.S.C. § 14501(b)(1) (emphasis added).

The Supreme Court has interpreted "related to" in these provisions as including state laws "having a connection with or reference to" such services, whether directly or indirectly. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). The connection may be "indirect," and a state law still will be preempted as long as it has a "significant impact" on the FAAAA's "deregulatory and preempted-related objectives." *See Rowe*, 552 U.S. at 370-71 (internal quotation marks and citations omitted). Because the ordinary meaning of the phrase "related to" is broad, the FAAAA expresses a broad preemptive purpose. *Pelkey*, 569 U.S. at 260. Thus, the FAAAA preempts any state laws related to the services of any broker with respect to the transportation of property, except for laws having only a tenuous or peripheral connection to such services. *Id.* at 261.

It is also well-established that the FAAAA's preemption provision is not limited to state statutes and regulations but also includes common law rules as "other provision[s] having the force and effect of law" if they have the effect of binding brokers to specific prices, routes, or services. *See e.g.*, *Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453, 458 (7th Cir. 2023) (citing *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281-82 (2014)); *Loyd v. Salazar*, 416 F. Supp. 3d 1290, 1295 (W.D. Okla. 2019) ("There is no question that a common law negligence claim embodies a state law that may be preempted under proper circumstances" by the FAAAA). Thus, Congress expressly preempted state common law negligence claims against federally licensed brokers that relate to broker services.

THORPE SHWER, P.C.

6

9485539

THORPE SHWER, P.C.

**C.    The FAAAA expressly preempts Plaintiffs' state common law claims relating to services provided by a federally licensed broker.**

J.B. Hunt is a federally licensed broker and the service it provides in appointing and contracting with motor carriers to transport property is federally regulated. 49 C.F.R. § 371.2(c). Plaintiffs' negligence-based claims for negligent hiring, supervision, entrustment and retention all functionally allege that J.B. Hunt should have provided enhanced services of investigating and evaluating the motor carrier it selected, and is also vicariously liable for the actions/inactions of the selected motor carrier and the motor carrier's employees. In other words, Plaintiffs' claims attempt to dictate the scope and level of services that J.B. Hunt provides as a broker. Allowing such claims to survive a motion to dismiss would have an enormous impact on how brokers operate, thereby thwarting Congress' deregulatory objectives of the FAAAA. Imposing state law duties and/or standards of care for a broker's investigation and selection of a motor carrier obviously has a direct connection to the core services a broker provides with respect to the transportation of property. As such, all of Plaintiffs' state common law claims against J.B. Hunt should be dismissed as preempted under the FAAAA and/or ICCTA.

Three United States Courts of Appeals that have considered this issue of whether preemption applies to negligent hiring or negligent selection claims against brokers, and each court has found that such claims are expressly subject to the FAAAA preemption provision under 49 U.S.C. § 14501(c)(1). *See Ye v. GlobalTranz Enters.*, 74 F.4th at 459 (holding plaintiff's negligent hiring claim expressly preempted by the FAAAA because it "strikes at the core of [the] broker services"); *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1267 (11th Cir. 2023) (noting that "the plain text of the FAAAA makes plain that the [plaintiff's] negligence claims relate to a broker's services with respect to the transportation of property."); *Miller v. C.H. Robinson Worldwide, Inc.,* 976 F.3d 1016, 1024 (9th Cir. 2020) ("[A] claim that imposes an obligation on brokers at the point at which they arrange for transportation by motor carrier has a 'connection with' broker services."). Moreover, these decisions found that the FAAAA's preemption encompasses

7

9485539

state laws of general applicability, and is not limited to laws that specifically target the trucking industry if the claims allege negligence with respect to the transportation of property. *Aspen*, 65 F.4th at 1268.

Plaintiffs' vicarious liability claims are preempted under the FAAAA for the same reasons as the negligence-based claims. Here, Plaintiffs allege that J.B. Hunt is vicariously liable for the alleged negligence of Borderlanders and/or Bekmuradov based on *respondeat superior* and statutory employment. *See* Compl. at ¶¶ 35-37. Although these claims are based upon the underlying conduct of Borderlanders and/or Bekmuradov, they are also preempted under the FAAAA under the same rationale applicable to the direct-negligence claims because enforcing vicarious liability on J.B. Hunt for the negligence of other motor carriers would amount to using state tort law to determine and control how common broker services are provided, contrary to congressional intent to subject brokers to uniform regulation of the services it provides in selecting motor carriers. All common law tort claims have the force and effect of law—thereby "falling comfortably within the language of the [FAAAA's] preemption provision[.]" *Ye*, 74 F. 4th at 459 (internal quotation marks and citations omitted). The "jurisdictional provenance of a tort, or the type of tort at issue" does not make a difference to that conclusion. *Tischauser v. Donnelly Transp. Inc.*, 2023 U.S. Dist. LEXIS 215815, at *4 (E.D. Wis. 2023) (clarifying the preemption inquiry is focused on whether the state tort law claim would have a significant impact on broker services) (citations omitted); *Lee v. Werner Enterprises, Inc.*, 2022 U.S. Dist. LEXIS 200848 (N.D. Ohio 2022) (dismissing, as preempted, plaintiff's personal injury claims against broker for both negligent motor carrier selection and vicarious liability claims because they significantly impact broker's services); *Gillum v. High Standard, LLC*, 2020 U.S. Dist. LEXIS 14820, at *1-6 (W.D. Tex. 2020) (same).

For the foregoing reasons, Plaintiffs' state common law claims against J.B. Hunt are preempted by the FAAAA and/or ICCTA. However, such a finding would not preclude Plaintiffs from obtaining relief as they can pursue their claims against the motor carrier, Borderlanders, and the driver, Bekmuradov, entities already required by the

FMCSA to maintain insurance coverage and comply with the other comprehensive safety standards, none of which are preempted by the FAAAA. *See Creagan v. Wal-Mart Transp., LLC*, 354 F. Supp. 3d 808, 814 (N.D. Ohio 2018) (finding that the FAAAA preempted plaintiff's negligent hiring claim but noting that the plaintiffs "are not without judicial recourse" as "the motor carrier may still be liable for negligence.").

**D.    The FAAAA motor vehicle "safety exception" does not apply here.**

The FAAAA preemption statute has several "exceptions" for certain state regulations directed to motor vehicle safety (the "Safety Exception"). *See* 49 U.S.C. § 14501(c)(2)(A). This portion of the statute provides in relevant part that the following matters are not covered by the FAAAA's express preemption provision:

> [The FAAAA] shall not restrict the <u>safety regulatory authority</u> of a State <u>with respect to motor vehicles</u>, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A) (emphasis added). In other words, claims based on state common law (*e.g.*, negligent hiring and vicarious liability) are preempted under the FAAAA unless the court finds: (1) the law in question falls under the state's traditional safety regulatory authority; and (2) the application of the law concerns motor vehicles.

Federal courts have found that state common law negligence actions are within the traditional safety regulatory authority of the state. *See Miller*, 976 F.3d at 1026 (concluding that state common law negligence actions fall under this provision); *Aspen*, 65 F.4th at 1269 ("Safety concerns thus clearly animate some tort standards, even if a breach of those standards leads only to property loss instead of bodily injury"). As such, Plaintiffs' state common law negligence claims against J.B. Hunt for personal injuries arising from this motor vehicle accident are within the safety regulatory authority of the state (*i.e.*, part one of the two-step inquiry in the application of the Safety Exception). Instead, the issue in this case is whether Plaintiffs' claims against J.B. Hunt, the broker, satisfy the second requirement of the Safety Exception - "with respect to motor vehicles."

9

9485539

THORPE SHWER, P.C.

A fair reading of the statutory text and applicable federal case law reveals that it does not.

Three Circuit Courts have addressed the issue of whether a common law negligent hiring claim against a freight broker is "with respect to motor vehicles" such that the Safety Exception applies; the Supreme Court has yet to take up this questions. The Ninth Circuit was the first, in *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016 (9th Cir. 2020). The *Miller* court adopted a broad interpretation of the "with respect to motor vehicles" language in the Safety Exception, finding that it could include negligence standards that promote safety on the road. *Id.* at 1030. The court indicated that the phrase "with respect to" is analogous to "relating to"—thereby expanding the Safety Exception to laws which have a "connection with motor vehicles" whether "directly or indirectly." *Id.* (internal quotation and citation omitted). In reaching this conclusion, the court relied upon a "presumption against preemption" to resolve any ambiguity in the breadth of the Safety Exception's scope. *Id.* at 1021. However, two years after the *Miller* decision, the Ninth Circuit held that courts should *not* invoke a presumption against preemption when, as here, a statute contains an express preemption clause. *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (quoting *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). Thus, the *R.J. Reynolds* court refused to follow *Miller* as the parties failed to address the Supreme Court's ruling in *Franklin*.

Since *Miller*, two other Circuit Courts have taken up the issue, finding that preemption applies to state common law negligence claims and the Safety Exception does not apply, and specifically addressed the frailties with the *Miller* court's analysis. *See Ye*, 74 F.4th 453 (7th Cir. 2023); *Aspen*, 65 F.4th 1261 (11th Cir. 2023). Both cases are instructive in this matter.

### 1. *Aspen finds that only laws having a "direct relationship" with motor vehicle safety fall under the Safety Exception.*

The Eleventh Circuit's decision in *Aspen* involved a factually analogous situation to *Miller*. 65 F.4th 1261 (11th Cir. 2023). However, the *Aspen* court determined that the negligent hiring claim against the broker was preempted under the FAAAA because the

10

9485539

THORPE SHWER, P.C.

"with respect to motor vehicle" language in the Safety Exception was inapplicable for three reasons. *Id.* at 1270-71. **First**, the *Aspen* court noted that the Supreme Court previously determined that the phrase "with respect to the transportation of property" in the statute's immediately preceding subsection (49 U.S.C. § 14501(b)) "massively limits" the scope of the Safety Exception. *Id.* at 1271 (quoting *Pelkey*, 569 U.S. at 261). The court noted that it only makes sense to read the similar phrase "with respect to motor vehicles" in the Safety Exception as also substantially limiting to be consistent with the Supreme Court's interpretation of "with respect to the transportation of property." *Id.* **Second**, the broad interpretation of the Safety Exception in *Miller*; allowing claims with only an "indirect connection," violates the basic premise of statutory construction because it renders the phrase "with respect to motor vehicles" with no meaningful operative effect. *Id.* (citations omitted). **Third**, the other items listed in the Safety Exception after "with respect to motor vehicles" (quoted above) would be meaningless under a broad interpretation because those provisions all have an "indirect connection" with motor vehicles (*e.g.*, highway route controls, transportation of hazardous waste, and carrier financial responsibilities). *Id.* at 1271-72. Thus, the court determined that the "with respect to motor vehicles" language in the Safety Exception requires "a direct relationship." *Id.*

The *Aspen* court further noted that the statutory definitions of a "broker" and a "motor carrier" are mutually exclusive. *Id.* at 1272. Motor carrier is defined as "a person providing motor vehicle transportation for compensation," and a broker is "a person . . . that . . . sell[s], provide[s], or arrang[es] for, transportation by motor carrier for compensation." *Id.* (citing 49 U.S.C. §§ 13102(2), 13102(14)). In light of these definitions, the court found that a claim against a broker is "necessarily" one step removed from a "motor vehicle" because the definition of a broker makes clear that the services it provides have no direct connection to motor vehicles. *Id.* (citing the dissent in *Miller*, 976 F.3d at 1031) ("[A broker] and the services it provides have no direct connection to motor vehicles or their drivers. … That attenuated connection is simply too remote for the safety exception" to apply). Moreover, the court concluded that the "mere indirect connection"

11

9485539

between claims of negligent selection of a motor carrier and "with respect to motor vehicles" made the Safety Exception inapplicable. *Aspen*, 65 F.4th at 1272.

### 2. *Ye finds the plain text of the Safety Exception in the context of Title 49 supports a narrower construction than Miller.*

The Seventh Circuit in *Ye* dealt with the same issues as *Miller* and *Aspen*. Like *Aspen*, the *Ye* court rejected the holding in *Miller*, concluding that the phrase "with respect to" is equivalent to "concern," meaning the Safety Exception would only save state laws that "concern motor vehicles" from preemption." 74 F.4th at 460 (citations omitted). The court noted Congress defined motor vehicles as "a vehicle, machine, tractor, trailer, or semitrailer . . . used on a highway in transportation," but notably did not include freight forwarders or freight brokers in either the definition or the text of the Safety Exception. *Id.* Further, the court emphasized that Congress chose not to create a parallel safety exception for preempted state laws regulating freight broker intrastate rates, routes, and services: "Congress's decision not to write a safety exception for the broker-specific preemption provision indicates a purposeful separation between brokers and motor vehicle safety." *Id.* at 461 (citing 49 U.S.C. § 14501(b)(1)). The court found these exclusions notable: "***Congress's inclusion of brokers in one subsection and exclusion in another suggests that the omission was intentional***." *Id.* (emphasis added).

The *Ye* court found that negligent selection and hiring claims did not directly connect brokers with motor vehicle safety and that upholding such claims would require "an extra link" that "goes a bridge too far." *Id.* at 462. The court cautioned that broader interpretations would expand the Safety Exception "without a clear, text-based limit" and that Congress would not authorize such a broad reading of the Safety Exception when it "itemized" and particularized specific regulations. *Id.* The court found further support for its position in other statutes under Title 49 that address motor vehicle safety and motor carriers, none of which include brokers. *Id.*; *see e.g.*, 49 U.S.C. § 30102(a)(9) (defining "motor vehicle safety" as the "performance of a motor vehicle…in a way that protects the public against unreasonable risk of accidents occurring because of the design,

12

9485539

THORPE SHWER, P.C.

construction, or performance). The court also noted that in creating the FMCSA, Congress sought to regulate motor carriers and their drivers, but did not extend the same or similar regulations to brokers. *Id.* at 463 (citing 49 C.F.R. §§ 350.101-350.417). The court recognized that each of the definitions and examples in Title 49 do <u>not</u> include broker services. *Id.* (emphasis added).

Finally, the *Ye* court addressed *Miller*, offering "three major analytical differences that account for [their] opposing interpretations of § 14501(c)(2)(A)." *Id.* at 465. **First**, the Ninth Circuit "unduly emphasized Congress's stated deregulatory purpose in passing the act," without considered the broader statutory scheme. *Id.* "[W]e do not see how Congress's deregulatory goals can overcome the clear statutory mandate that the exception . . . saves only those safety regulations directly concerning motor vehicles." *Id.*; *see Miller*, 976 F.3d at 1031. **Second**, the Ninth Circuit's reliance on the presumption against preemption in *Miller* conflicts with the Supreme Court's instruction to "focus on the plain wording of the clause" instead of "invok[ing] any presumption against pre-emption" when a statute contains an express preemption clause. *Ye*, 74 F.4th at 465 (quoting *Franklin*, 579 U.S. at 125). **Third**, the Ninth Circuit's conclusion that the phrase "with respect to" is "synonymous" with the broad phrase "relating to" ignores Congress's specific word choice for the Safety Exception. *Id.* Because Congress had previously used "related to" in the preceding subsection, it could have used the phrase again if necessary. *Id.* at 465-66. Instead, Congress specifically chose to limit the Safety Exception to those laws which impose liability "with respect to motor vehicles", implying that Congress did not intend for the Safety Exception to apply broadly. *Id.*

Following *Aspen* and *Ye*, courts in the Third Circuit, Fourth Circuit, Fifth Circuit, Seventh Circuit, and Eighth Circuit, relied upon these opinions, finding negligence claims against brokers to be preempted under the FAAAA and outside of the Safety Exception. *See Lee v. Golf Transp., Inc.*, 2023 U.S. Dist. LEXIS 200143, at *46-47 (M.D. Pa. 2023) (finding the Safety Exception inapplicable); *Mays v. Uber Freight, LLC*, 2024 U.S. Dist. LEXIS 15434, at *3 (W.D. N.C. 2024) (holding that the FAAAA preempted plaintiffs'

13

9485539

THORPE SHWER, P.C.

negligence claims); *Hamby v. Wilson*, 2024 U.S. Dist. LEXIS 90897, at \*14 (E.D. Tex. 2024) (same); *Tischauser*, 2023 U.S. Dist. LEXIS 215815, at \*4 (E.D. Wis. 2023) (same); *Girardeau v. Hobbs*, 2023 U.S. Dist. LEXIS 146196, at \*4 (E.D. Mo. 2023) (stressing the plain meaning of the FAAAA's preemption provision and the general nature of brokers in Title 49 to dismiss the negligence claim against the freight broker).

Taken together, Plaintiffs' Arizona common law negligent hiring claim against the broker of the Load, J.B. Hunt, is preempted under the FAAAA because it is related to the core services brokers provide. *See* Section III (C), *supra*. Moreover, the Safety Exception does not apply because Plaintiffs' negligence-based claims have no direct connection "with respect to motor vehicles." As discussed above, the two most recent appellate opinions in *Aspen* and *Ye* held that the Safety Exception does not apply to preempted negligent hiring claims against brokers. These courts also addressed the numerous issues with the Ninth Circuit's decision in *Miller*, which this Court should consider when determining this Motion, including the Ninth Circuit's walking back of the "presumption against preemption" reasoning in a later case. *See R.J. Reynolds*, 29 F.4th at 553 (acknowledging that its reliance on the presumption against preemption in *Miller* was in direct conflict with the Supreme Court's instruction to "focus on the plain wording of the clause" instead of "invok[ing] any presumption against pre-emption.") (internal quotations and citations omitted). Accordingly, this Court should follow the reasoning and holdings in *Aspen* and *Ye*, as well as the subsequent district court decisions listed above, to determine that Plaintiffs' state common law claims against J.B. Hunt are expressly preempted under the FAAAA, and that the Safety Exception does not apply.

### E.    Plaintiffs' negligent hiring, supervision, entrustment, and retention claims against J.B. Hunt fail.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

14

9485539

THORPE SHWER, P.C.

the defendant is liable for the misconduct alleged." *Id.* The court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations. *See In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016); *see also In re Rigel Pharmaceuticals, Inc. Securities Litig.*, 697 F.3d 869, 875 (9th Cir. 2012) (complaint must provide more than labels and conclusions, and formulaic recitations).

Even if not preempted as outlined above, Plaintiffs' direct-negligence claims against J.B. Hunt – negligent hiring, supervision, entrustment, and retention – still fail to state a claim upon which relief can be granted. A complaint containing such counts is subject to dismissal if it fails to plead ***how*** the employer was negligent in its hiring, retaining, controlling, supervising, or training the employee. *See Petty v. Arizona*, 2016 U.S. Dist. LEXIS 101038, *4-5 (D. Ariz. 2016) (granting defendant's motion to dismiss a negligent training and supervision claim when plaintiffs failed to state non-conclusory allegations or facts showing how the deficient training led to the death); *see also Ripa v. Fannie Mae*, 2013 U.S. Dist. LEXIS 150958, *13-14 (D. Ariz. 2013) (granting defendant's motion to dismiss in part because the plaintiff did not allege "***how*** Defendants were negligent in hiring, training, or supervising such an employee") (emphasis added); *Mendez v. City of Scottsdale*, 2012 U.S. Dist. LEXIS 126591, *19 (D. Ariz. 2012) (granting defendant's motion to dismiss negligent hiring, training, supervision, and retention claims because "[o]ther than [a] conclusory allegation," "Plaintiff has not alleged facts which make is plausible that the City was negligent").

Here, the Complaint states that J.B. Hunt is "liable for its negligent hiring, supervision, entrustment, and retention of Borderlanders" because it "knew or should have known that Borderlanders had a history of hiring inexperienced and incompetent drivers that put the motoring public at risk." Compl. at ¶ 38. This single conclusory allegation is not sufficient to support Plaintiffs' claims. Indeed, Plaintiffs do not state any non-conclusory allegations or facts demonstrating what facts J.B. Hunt would have discovered or how J.B. Hunt antecedently had reason to believe that an undue risk of harm would exist because of Borderlanders selection, an authorized federal motor carrier. Nor does the

15

9485539

Complaint set forth any facts that identify how J.B. Hunt's alleged supervision was negligent, or how the allegedly negligent supervision was the proximate cause of Plaintiffs' harm. As a result, Plaintiffs' claims for negligent hiring, supervision, entrustment, and retention fail to state a claim and should be dismissed.

**F.      Plaintiffs' vicarious liability claim against J.B. Hunt fails.**

The Complaint alleges that J.B. Hunt was "the motor carrier accepting responsibility" and "is vicariously liable under federal statutes and regulations governing interstate shipping for the negligence of its statutory employee [Bekmuradov]." Compl. at ¶ 35. In other words, Plaintiffs' vicarious liability claim hinges on whether J.B. Hunt was the motor carrier in relation to the Load. However, the Complaint is devoid of any non-conclusory allegations or facts that would support a plausible claim that J.B. Hunt was acting as the motor carrier at the time of the incident. Instead, the allegations in the Complaint demonstrate that J.B. Hunt was acting as the broker: Borderlanders is a corporation in good standing and doing business in Arizona as a general freight carrier (Compl. at ¶ 7); J.B. Hunt uses both company-owned and outsourced trucks and drivers for transportation services (*Id.* at ¶ 19); J.B. Hunt has an OCA with Borderlanders (*Id.* at ¶ 22); pursuant to the OCA, J.B. Hunt selected Borderlanders to pick up, transport, and deliver the property, which in turn, sent its truck driver Bekmuradov to handle the transport (*Id.* at ¶ 24); Borderlanders is vicariously liable for the negligence of its employee Bekmuradov (*Id.* at ¶ 39); and Borderlanders is also liable for its negligent hiring, supervision, entrustment, and retention of Bekmuradov (*Id.* at ¶ 40).

These allegations make clear that Borderlanders was the motor carrier selected to transport the Load in question, which it undertook with its motor vehicle and driver, reflecting J.B. Hunt's status as the freight broker, not the motor carrier. This is further supported by the terms of the OCA, detailing Borderlanders' status as the motor carrier. As such, the Complaint fails to allege a plausible claim for relief against J.B. Hunt as the alleged motor carrier at the time of the incident.

. . .

16

THORPE SHWER, P.C.

9485539

Moreover, the statutory definitions and applicable federal case law establish J.B. Hunt's status as the broker. *See* Section III (A), *supra*. The federal definition of a broker and motor carrier make clear that brokers and motor carriers are two distinct types of entities and conduct entirely different operations. *See Puga v. RCX Sols., Inc.*, 922 F.3d 285, 292 (5th Cir. 2019) ("[p]ut briefly, a motor carrier transports, and a broker provides a motor carrier"). While entities may have authorization to act as both a motor carrier and broker (49 U.S.C. § 13904(d)(1)), they cannot act both as a broker and a motor carrier on the same shipment. *See* 49 C.F.R. § 371.2(a) ("Motor carriers . . . are not brokers within the meaning of this section when they arrange . . . the transportation of shipments which they . . . have accepted . . . to transport.").

Here, J.B. Hunt was the broker because it arranged for the transportation of property by selecting a motor carrier, Borderlanders, who used its own motor vehicle and driver to transport the Load when the incident occurred. As such, Plaintiffs' conclusory allegations that J.B. Hunt was the motor carrier are factually and legally unsupported. For these reasons, Plaintiffs' allegations are insufficient to state a plausible claim for relief that J.B. Hunt was the motor carrier and is vicariously liable for Bekmuradov's alleged negligence.

## V.    CONCLUSION

For all the reasons set forth herein, Plaintiffs' claims against J.B. Hunt are federally preempted under the FAAAA and/or the ICCTA, and further fails to state a claim against J.B. Hunt upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Therefore, J.B. Hunt respectfully requests that this Court dismiss Plaintiffs' Complaint with prejudice and without leave to amend as amendment would be futile in light of the express preemption provisions of the FAAAA and/or ICCTA.

. . .

. . .

. . .

. . .

17

9485539

DATED this 10th day of June, 2024.

**THORPE SHWER, P.C.**


By */s/ William L. Thorpe*

William L. Thorpe
Ryan S. Patterson
Ian R. King
***Attorneys for J.B. Hunt Transport, Inc.***

THORPE SHWER, P.C.

18

9485539

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of June, 2024, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing, to the following CM/ECF registrants:

K. Thomas Slack, Esq.
BEALE, MICHEAELS, SLACK & SHUGART, PC
7012 N. 18th Street
Phoenix, AZ 85020
tslack@bmsslaw.com
***Attorney for Plaintiffs***

Craig R. McClellan, Esq. (*Pro Hac Vice* Pending)
Conor J. Hulbert, Esq. (*Pro Hac Vice* Pending)
THE McCLELLAN LAW FIRM
1144 State Street
San Diego, CA 92101
craig@mcclellanlaw.com
conor@mcclellanlaw.com
***Attorneys for Plaintiffs***

/s/ Joan Peralta
Legal Assistant

THORPE SHWER, P.C.

19

9485539